# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE          )
                          )
          v.              )     I.D. No. 1504010863A
                          )
MICHAEL BROOMER,          )
                          )
          Defendant.      )


Submitted: July 2, 2021
Decided:  October 25, 2021


*Upon Defendant Michael Broomer's Amended Motion for Postconviction Relief*
**DENIED.**

**MEMORANDUM OPINION AND ORDER**


Maria T. Knoll, Esquire, Deputy Attorney General, Department of Justice, 820 North French Street, Wilmington, DE 19801, Attorney for the State of Delaware.

Samuel L. Guy, Esquire, P.O. Box 25464, Wilmington, DE 19899, Attorney for Defendant Michael Broomer.

**WHARTON, J.**

# 1. INTRODUCTION

This case is before the Court on Defendant Michael Broomer's ("Broomer") Amended Motion for Postconviction Relief ("AMPCR"). Broomer was convicted at trial of Murder in the Second Degree, two counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), and one count of Reckless Endangering in the First Degree. He appealed his convictions to the Delaware Supreme Court. That Court affirmed the judgment of this Court in part and remanded in part for this Court to a complete a *Batson* analysis. This Court, over Boomer's objection, completed its *Batson* analysis on the record as it existed at trial without holding an evidentiary hearing or allowing additional briefing. The Court found that that Broomer had not carried his burden of proving purposeful discrimination. The Supreme Court affirmed that decision.

Through counsel, Broomer alleges ineffective assistance of counsel ("IAC") on the part of both his trial and appellate counsel. In all, he raises 21 claims. The Court has carefully considered each one. Some are new issues, some are merely conclusory allegations without support in the record, some are just second guessing, and some are previously addressed issues repackaged as IAC claims, but all are without merit. Accordingly, the AMPCR is **DENIED.**

2

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

Broomer and his co-defendant, Atiba Mayfield ("Mayfield"), were both charged with Murder in the First Degree, and various other crimes in connection with the shooting of Raekwan Mangrum ("Mangrum") on April 4, 2015 in Wilmington. The homicide was witnessed, at least in part, by Wilmington Police Officer Matthew Begany. Officer Begany heard what he thought were gunshots while on patrol traveling west on 4th Street toward Monroe Street. He turned southbound onto Monroe Street and observed a blue Focus at the end of an alleyway between 2nd and 3rd Streets. He saw a man standing outside of the Focus firing a handgun. Officer Begany called for backup and drove down the alleyway toward the Focus and the man firing the gun. He then lost sight of the shooter as the Focus began to head northbound towards his car and then turn suddenly onto a sidewalk between two rows of houses. At that point, Officer Begany saw two black males in the vehicle and broadcast the Focus' license plate over the radio. He continued down the alleyway and observed Mangrum, who had been shot multiple times, a woman who had also been shot once in the leg, and her young child, who was not injured. The woman survived, but Mangrum died the next day.

After several Wilmington Police Officers spotted the Focus, a high-speed vehicle chase ensued involving many police officers. During the chase northbound

---

[1] The facts are taken from *Broomer v. State,* Del. Supr. No. 562, 2016, Order, Vaughn, J. (Oct. 16, 2017), D.I. 53, and this Court's Opinion on Remand, *State v. Broomer,* Super. Ct. No. 1506014357 (Del. Super. Ct. Nov. 14. 2017), D.I. 57.

on I-95, one of the officers observed a handgun being thrown from the passenger side of the Focus.  A CZ .40 caliber semi-automatic firearm was recovered in the area where the officer saw a weapon being thrown from the Focus.  A .380 Cobra FS 380, with one spent casing and five live rounds of ammunition was also found in along the path of the chase.  Ultimately the chase ended in Pennsylvania where the driver, Broomer, and the passenger, Mayfield, fled on foot, but quickly were taken into custody. The police recovered a box of .380 ammunition from under the driver's seat of the Focus and a spent shell casing under the passenger side floor mat. Broomer was convicted by a jury of Murder in the Second Degree, Reckless Endangering in the First Degree and two counts of PFDCF.

Broomer raised several issues on appeal.  Those issues dealt with the adequacy of the Court's instruction on accomplice liability, allegations of prosecutorial misconduct in the State's closing arguments, the admission of claimed improper lay opinion and expert testimony, and an incomplete *Batson* analysis.  The Supreme Court affirmed on all but the *Batson* issue and remanded the case to this Court to complete the *Batson* analysis while retaining jurisdiction.[2]

On remand,  Broomer requested an evidentiary hearing followed by briefing, while the State opposed that request and argued that the record was closed and that the Court should complete the *Batson* analysis on that record.  The Court denied the Broomer's request and determined to complete the *Batson* analysis on the existing

---

[2] *Broomer v. State,* D.I. 53.

record. The Court denied the *Batson* challenge and returned the case to the Supreme Court.[3] There, this Court's decision on remand was affirmed.[4]

On October 22, 2018, Broomer filed a *pro se* Motion for Postconviction Relief,[5] which was followed on March 29, 2019 by retained counsel's AMPCR alleging IAC.[6] On May 24, 2019, trial counsel filed a joint affidavit in response to the IAC allegations.[7] On June 4, 2019 appellate counsel did the same.[8] The State answered on October 14, 2019.[9] Retained postconviction counsel submitted a Response to the State's Answer on July 2, 2021.[10]

## III. THE PARTIES' CONTENTIONS

The AMPCR raises a total of 21 IAC claims against both trial and appellate counsel. It alleges they were ineffective in that: 1) trial counsel did not challenge by requesting a "*Lolly*" instruction the State's failure to gather and preserve exculpatory gunshot residue ("GSR") evidence from the Focus, Mangrum, and Mangrum's clothing; 2) appellate counsel failed to object to the Court's *Batson* analysis on remand, and trial counsel allowed non-white and male jurors to be improperly excluded from the jury, while allowing some jurors to be seated who should have

---

[3] *State v. Broomer*, D.I. 57.
[4] *Broomer v. State*, 2017 WL 5900084 (Del. Nov. 28, 2017).
[5] Motion for Postconviction Relief, D.I. 60.
[6] AMPCR, D.I. 79.
[7] Trial Counsel's Aff., D.I. 81.
[8] Appellate Counsel's Aff., D.I. 82.
[9] State's Ans., D.I. 90.
[10] Def.'s Resp., D.I. 124.

5

been excluded; 3) trial counsel failed to cross-examine State's witness Nicodemus Morris effectively; 4) trial counsel failed to cross-examine State's witness Tyezghaire Stevens effectively; 5) trial counsel failed to object to improper remarks during the prosecution's closing argument and appellate counsel failed raise that issue on appeal; 6) trial counsel failed to object to Morris' testimony that a prior drug case provided the motive to the shooting; 7) trial counsel failed to challenge the testimony of the State's ballistics expert Carl Rone and to retain a defense ballistics expert; 8) trial counsel failed to call exculpatory witnesses to explain Broomer's presence at a shopping center near the crime scene; 9) trial counsel failed to object to the flight instruction the Court gave; 10) trial counsel failed challenge the Court's accomplice liability instruction effectively; 11) trial counsel failed to object to the Court speaking to the jury privately and off the record during deliberations and appellate counsel failed to protect Broomer's right to attend a teleconference the Court conducted on remand; 12) trial counsel failed to object to the absence of a hung jury option on the verdict sheet; 13) appellate counsel failed to pursue a *Batson* evidentiary hearing on remand; 14) trial counsel incorrectly informed Broomer that an acquittal on the conspiracy charge would result in an acquittal on all other charges; 15) trial counsel failed to identify, investigate, and interview people present at the scene of the shooting; 16) trial counsel failed to pursue cellphone messages establishing a benign explanation for Broomer's presence at the crime scene, to question Det. Fox, the State's chief investigating officer about those messages, and

6

to call any fact or expert witnesses on Broomer's behalf; 17) trial counsel failed to move for a change of venue; 18) on appeal, appellate counsel failed to question the absence of sidebar conferences on the record; 19) appellate counsel failed to inform Broomer of his right to appeal the Delaware Supreme Court's decision to the United States Supreme Court; 20) appellate counsel failed to make an argument regarding a *Chance* instruction; and 21) trial counsel failed to object to Det. Fox testifying as an expert regarding the identification of a gun from a cellphone photograph.[11]

The State opposes the AMPCR in its detailed point-by-point response.[12] The State argues, based on the affidavits of counsel and the trial and appellate records, that: 1) DNA evidence would have proved nothing, the existing GSR results favored Broomer's theory of the case that co-defendant Mayfield unexpectedly shot Mangrum, and no *Lolly* instruction was warranted because there was no reason to believe any exculpatory evidence would have been present on the exterior of the Focus or on Mangrum or his clothing; 2) the *Batson* claim is without merit because appellate counsel did argue for a hearing on remand, the Supreme Court considered the issue and decided it adversely to Broomer, and the record does not support other potential *Batson* claims; 3) trial counsel effectively cross-examined Nicodemus Morris; 4) trial counsel effectively cross-examined Tyezghaire Stevens; 5) appellate counsel did raise issues of prosecutorial misconduct on appeal, but was unsuccessful;

---

[11] AMPCR, Attach 1, D.I. 79.
[12] State's Ans., D.I. 90.

6) evidence of the prior drug case clearly was admissible motive evidence; 7) Carl Rone's arrest did not occur until *after* Broomer's trial and direct appeal, his testimony supported Broomer's defense that Mayfield was the shooter, and, Broomer has failed to offer any evidence that impeaches Rone's expert opinions; 8) trial counsel hired a private investigator who was unable to locate exculpatory witnesses 9) the flight instruction given by the Court was appropriate; 10) the accomplice liability instruction given by the Court was appropriate; 11) the claim that the Court held private off the record conversations with the jury is merely conclusory and is unsupported by the record, and Broomer fails to show that he was prejudiced by his absence from the teleconference the Court held on remand or that his presence was required; 12) there is no legal basis to include a hung jury option on the verdict form; 13) appellate counsel did pursue a hearing on remand, albeit unsuccessfully; 14) trial counsel and the verdict form itself do not support Broomer's recollection that he was told an acquittal on the conspiracy charge would result in an acquittal on all charges; 15) trial counsel retained a private instructor who was unable to locate exculpatory witnesses from the scene of the crime; 16) Broomer has failed to substantiate his claim that the cell phones provide exculpatory evidence; 17) Broomer's allegation that trial counsel was ineffective in failing to move for a change of venue is unsupported by any facts establishing juror prejudice; 18) Broomer's claim that trial counsel failed to question the absence of side bar conferences is difficult to understand, but to the extent Broomer claims he was

8

prejudiced by unreported side bar conferences, the claim is unsupported by the record; 19) even if appellate counsel had not discussed a possible appeal to the United States Supreme Court with Broomer (which appellate counsel says he did discuss with Broomer), he can show no prejudice because that court would not have accepted Broomer's case; 20) Both trial and appellate counsel raised the claim that a *Chance* instruction was necessary, thus any claim that they failed to do so is without merit; and 21) Broomer's claim that trial counsel was ineffective in failing to object to Det. Fox testifying as an expert is without merit because the Delaware Supreme Court determined that Det. Fox's testimony was proper.[13]

Broomer requested an opportunity to reply, which the Court granted. After multiple extensions, Broomer submitted his Response on July 2, 2021. In the main, the 86-page Response reiterates and amplifies the claims asserted in the AMPCR.[14]

## IV. STANDARD AND SCOPE OF REVIEW

Before addressing the merits of a defendant's motion for postconviction relief, the Court must first apply the procedural bars of Superior Court Criminal Rule 61(i).[15] If a procedural bar exists, then the Court will not consider the merits of the postconviction claim.[16] Under Delaware Superior Court Rules of Criminal Procedure, a motion for postconviction relief can be barred for time limitations,

---

[13] *Id.*
[14] Def,'s Resp., D.I. 124.
[15] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[16] *Id.*

9

repetitive motions, procedural defaults, and former adjudications. A motion exceeds time limitations if it is filed more than one year after the conviction becomes final or if it asserts a newly recognized, retroactively applied right more than one year after it was first recognized.[17] A second or subsequent motion is repetitive and therefore barred.[18] The Court considers a repetitive motion only if the movant was convicted at trial and the motion pleads with particularity either: (1) actual innocence;[19] or (2) the application of a newly recognized, retroactively applied rule of constitutional law rendering the conviction invalid.[20] Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[21] Grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[22] Here, the MPCR constitutes a timely first motion for postconviction relief, alleging IAC.

To successfully bring an ineffective assistance of counsel claim, a claimant must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficiencies prejudiced the claimant by depriving him or her of a fair trial with reliable

---

[17] Super. Ct. Crim. R. 61(i)(1).
[18] Super. Ct. Crim. R. 61(i)(2).
[19] Super. Ct. Crim. R. 61(d)(2)(i).
[20] Super. Ct. Crim. R. 61(d)(2)(ii).
[21] Super. Ct. Crim. R. 61(i)(3).
[22] Super. Ct. Crim. R. 61(i)(4).

results.[23] To prove counsel's deficiency, a defendant must show that counsel's representation fell below an objective standard of reasonableness.[24] Moreover, a defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.[25] "[A] court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[26] A successful Sixth Amendment claim of ineffective assistance of counsel requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[27] An inmate must satisfy the proof requirements of both prongs to succeed on an ineffective assistance of counsel claim. Failure to do so on either prong will doom the claim and the Court need not address the other.[28]

In the appellate context, "[t]he [d]efendant must first show that his counsel was objectively unreasonable in failing to find arguable issues on appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."[29] Appellate counsel "need not (and should not) raise every

---

[23] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).
[24] *Id.* at 667-68.
[25] *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).
[26] *Strickland*, 446 U.S. at 689.
[27] *Id.* at 694.
[28] *Strickland,* 466 U.S. at 697; *Ploof v. State,* 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant.").
[29] *Neal v. State,* 80 A.3d 935, 946 (Del. 2013) (quoting *Smith v. Robbins,* 528 U.S. 259, 285 (2000)).

nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."[30]   Nonetheless, it is "still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent."[31]   A defendant faces a tougher burden of "showing that a particular nonfrivolous issue was clearly stronger than issues that counsel did present" where appellate counsel filed a merits brief, than in the case where appellate counsel filed a no merit brief.[32]   Further, Broomer must still show prejudice, "That is, [the defendant] must show a reasonable probability that, but for his counsel's unreasonable failure [to raise a clearly stronger issue], he would have prevailed on his appeal."[33]

## V. DISCUSSION

All 21 of the issues raised by the AMPCR are brought as IAC claims, and thus, at least facially, are not barred in this first timely postconviction relief effort.  However, some of the claims allege ineffectiveness by either appellate counsel or trial counsel in failing to raise, or raise effectively, issues that were raised earlier.  Broomer repeatedly fails to cite to specific places in the record in support of his arguments.  In many instances, he cites to statements of witnesses or police reports that may have been produced in

---

[30] *Id.* (citing *Smith*, 528 U.S. at 288).

[31] *Id.*

[32] *Id.*

[33] *Id.* at 947 (quoting *Smith,* 528 U.S. 285).

discovery but are not part of the record of the case in this court as that record is currently constituted. The failure to cite specifically to the record results in many of his IAC claims being unsubstantiated. To establish prejudice, he incants that the result would have been an acquittal, but for counsel's particular act of IAC. More substantiation is necessary to warrant relief. The Court now turns to the IAC claims in the order they were raised.

## A. Failure to Gather and Preserve Exculpatory Evidence and to Request *Lolly* Instruction (Claim 1).

Broomer alleges that trial counsel was ineffective in "fail[ing] to gather and preserve exculpatory evidence in the car and outside of the car that should have been tested for gunshot residue and DNA testing regarding the victim and codefendants [sic]."[34] He also argues Mangrum's hands and clothes should have been tested for GSR.[35] Broomer contends that trial counsel should have pursued the State's failure to collect this evidence in his cross-examination of Det. Fox.[36] Broomer's Response to the State's Answer discusses at length the potential significance of the missing GSR and DNA evidence in establishing that Broomer was not the shooter, and alleges that the failure to preserve that evidence was a violation of the prosecution's

---

[34] AMPCR, Attach. 1, at 1, D.I. 79.
[35] *Id.*
[36] *Id.*

obligation under *Brady*.[37]   The Response also invokes *Lolly*[38] and *Deberry*[39] in attacking the State's failure to collect that evidence.[40]

Trial counsel, in their affidavit, explained the defense theory of the case.  That theory was that there was reasonable doubt that Broomer knew that Mayfield was going to shoot Mangrum and that Broomer lacked the requisite mental state to be convicted as an accomplice.[41]  Consistent with that strategy, trial counsel did not pursue GSR testing of the exterior of the vehicle because the existing GSR evidence supported the defense theory of the case.[42] Further, DNA evidence from the car would not have produced exculpatory results because the vehicle was in Broomer's possession and there was no evidence to suggest that Mangrum was near the Focus.[43]

Trial counsel's strategy was sound, given the limited options the facts presented.  In fact, it proved partially successful in that Broomer was not convicted of murder first degree.  It was also the State's theory that Broomer was the driver and Mayfield was the shooter.  Thus, additional GSR or DNA testing from the vehicle would not have been exculpatory.  It merely would have produced cumulative evidence on an issue not in controversy.  A failure

---

[37] *Brady v. Maryland,* 373 U.S. 83 (1963).
[38] *Lolly v. State,* 611 A.2d 956 (Del. 1992).
[39] *Deberry, v. State,* 457 A.2d 744 (Del. 1983).
[40] AMPCR, Attach. 1, at 1.
[41]. Trial Counsel's Aff. at 4, D.I. 81.
[42] *Id.,* at 3.
[43] *Id.*

14

to develop additional evidence on an uncontroverted issue does not meet *Strickland's* performance deficiency standard, nor does it establish prejudice.

Broomer's arguments regarding GSR testing of Mangrum's hands and clothing amount to nothing more than speculation.  No one testified that Mangrum shot anybody during the incident.  There was no reason for trial counsel to pursue evidence of a theory unsupported by any witness testimony.

## B.  The *Batson* Issues (Claim 2).

The AMPCR raises several *Batson*-related issues and alleges IAC on the part of both trial and appellate counsel.  Those issues relate to appellate counsel's performance on remand, and trial counsel's performance during jury selection.  It is, as the State suggests, an effort to relitigate the *Batson* issue raised at trial as an IAC claim.

### 1.  Appellate Counsel.

Broomer's complaint regarding appellate counsel seems to be twofold. First, he claims that appellate counsel was ineffective in not requesting a hearing and objecting in writing to the procedure employed by the Court in completing its *Batson* analysis on remand.[44]  Second, he argues that appellate counsel failed to file any objections or request briefing in the Supreme Court after this Court's decision on remand.[45]  As to the first, Broomer simply is

---

[44] AMPC, Attach., at 1, D.I. 79; Def.'s Resp, at 44, D.I. 124.
[45] Def.'s Resp., at 45, D.I. 124.

wrong. Appellate counsel did request an evidentiary hearing. On remand, "Broomer requested an evidentiary hearing followed by briefing…The Court denied the request for a hearing and further briefing and determined to complete the *Batson* analysis on the existing record.[46] As to the second, had the Supreme Court wanted additional briefing after the case was returned to it, it would have directed additional briefing. There is no reason to believe that Court would have looked favorably on a request to submit additional briefs, nor has Broomer presented any argument to suggest that it would. Broomer has failed to meet either prong of Strickland regarding appellate counsel.

### 2. Trial Counsel.

Broomer challenges the effectiveness of trial counsel's assistance in jury selection and in advancing his *Batson* challenge. The Court has identified 13 separate Batson-related IAC claims against trial counsel in the AMPCR. They are: 1) "[n]on-white and male jurors were allowed by counsel to be excluded from being on the jury for inconsistent reasons;" 2) trial counsel should have focused on gender balance, claiming trial counsel allowed 11 female jurors to be seated; 3) jurors who were school employees should have been challenged because a child was at the scene of the shooting; 4) an alternate juror who was a victim of a violent crime should have been stricken;

---

[46] *State v. Broomer,* at 4, D.I. 57.

5) a juror who worked with Broomer's father should have been stricken; 6) trial counsel should have objected to the State striking jurors Clay, Riggs-Potts, Price, and Munoz-Bonilla; 7) trial counsel should have challenged the State's explanation for striking certain jurors; 8) "[j]urors Lewis and Barone were treated differently; 9) the State contradicted itself since it did not strike jurors Gilchrest and Hearne; 10) trial counsel should have objected to the absence of information regarding juror Goines; 11) "Allen Stokes' statements are missing from the jury selection transcript in connection with *voir dire* without being challenged by Counsel in connection with the *Batson* analysis;" 12) juror Collins contaminated the jury pool with a comment about the location of the killer as evidenced by another juror expressing nervousness; and 13) counsel failed to obtain information and make arguments regarding the composition of the jury pool.[47]

The Court makes a few observations about the jury selection process. At the outset, jurors are given some limited information about the case, including the charges, the date and location the offenses are alleged to have occurred, the attorneys, the names of the potential witnesses, and the length of the trial. Then the jurors as a group are asked a series of questions designed to determine if a juror can be fair and impartial. Those jurors who have a "yes" answer to any of the questions are questioned individually by the Court

---

[47] AMPCR, Attach. 1, at 1-2, D.I. 79.

at sidebar with counsel, out of the presence of the other jurors. Based on the answers to the Court's questions, the juror either is excused or allowed to remain on the panel from which the jury is selected. Next, twelve jurors who have been randomly selected are seated in the jury box. Once those twelve jurors are seated, the parties begin exercising their allotment of six peremptory challenges each, beginning with the defense. The jury is selected when all peremptory challenges are exhausted or both sides are content with the jury. Alternate jurors are selected in the same fashion with each side having two peremptory challenges when four alternates are chosen.

The Court rehearses the jury selection process because it is important to remember how little control over jury selection trial counsel has. Counsel has limited information about a prospective juror – the juror's name, date of birth, gender, marital status, education, race, occupation, employer, spouse's occupation, previous jury service, and law enforcement employment, plus any additional, incidental information gleaned from individual *voir dire*. It is upon this limited data set and their own visual observations of prospective jurors that trial counsel make largely intuitive judgments about exercising and managing peremptory challenges. The subjective nature of jury selection establishes a high bar for postconviction counsel to overcome when seeking to challenge as objectively unreasonable trial counsel's prudential judgement about retaining or striking potential jurors.

As noted previously, a defendant must make concrete allegations of actual prejudice and support them or risk summary dismissal.[48] Many of the allegations fail that test. At a minimum, they are numbers 3, 4, 5, 10, 11, 12, and 13 identified above. Other allegations in the AMPCR – numbers 1, and 6-9 – relate to claims more fully discussed in Broomer's Response to the State's Answer. There is no reason to believe that jurors who work in schools would be unable to be fair and impartial merely because a child was present at the scene (number 3). The alternate juror who was the victim of a violent crime did not participate in deliberations (number 4). During trial, a juror recognized someone from work in the gallery and exchanged pleasantries with him outside of court. The juror was unaware the person was Broomer's stepfather.[49] When questioned by the Court, the juror stated she could remain fair and impartial.[50] Broomer does not explain how this juror remaining on the jury prejudiced him (number 5). Broomer does not specify what information is absent regarding juror Goines, or how any such absence prejudiced him (number 10). Allen Stokes, a black male, was seated as a juror. Broomer does not identify what statements made by Stokes are missing from the transcript or how the missing statements prejudiced him. It appears that the only thing that brought Stokes to sidebar was a mistaken belief that the

---

[48] *Strickland,* at 667-68.
[49] D.I. 90, at 27.
[50] *Id.*

trial judge presided over his daughter's adoption (number 11).[51]  Any comments made by potential juror Collins were made at sidebar and could not have contaminated the jury pool (number 12).  Broomer does not make any supported concrete allegations of prejudice in connection with his claim that trial counsel failed to "obtain information and make arguments concerning the composition of the jury pool" (number 13).

The Court addresses the remaining *Batson* claim in the AMPCR – number 2 – separately.  It asserts that trial counsel was ineffective and should have focused on gender balance and not have "allowed 11 females to be seated on the jury due to the fact that a female was shot."[52]  There is much wrong with this argument.  First, to the extent it implies that the jury that convicted Broomer was comprised of 11 women and one man, it is incorrect.  The jury that deliberated and returned verdicts was comprised of eight women and four men, while three of the four alternate jurors were woman.  Secord, while it is true that a woman was shot, she was not killed.  A man was killed.  Why a jury of mostly women would be more hostile to Broomer because a woman also was injured is not explained.  But third, and most importantly, Broomer is arguing that trial counsel were ineffective because they did not intentionally exercise their peremptory challenges based on gender.  "Gender, like race, is

---

[51] Tr. Aug. 8, 2016, at 56.
[52] AMPCR, Attach 1, at 1, D.I. 79.

an unconstitutional proxy for competence and impartiality."[53] The Court cannot find trial counsel ineffective because they did not improperly exercise challenges based on gender. It is curious that a party alleging trial counsel failed to aggressively pursue *Batson* violations would suggest as much.

Claim 2 of Broomer's Response and claim numbers 1 and 6-9 of the *Batson*-related arguments in the AMPCR listed above focus on alleged deficiencies in trial counsel's pursuit of the *Batson* claim they raised at trial. He faults trial counsel's response to the State's explanations for the exercise of its peremptory challenges, and proffers arguments that trial counsel could have asserted, but did not, as to each stricken juror, as well as additional arguments available to trial counsel.[54] It is worth noting that, unlike trial counsel who must present their arguments in the moment, Broomer has had the benefit of the fullness of time to research *Baston*-related case law, study the full jury selection transcript, and contemplate with virtually no temporal constraints what arguments could be crafted to make the most persuasive *Batson* challenge possible. Yet, the Court is not persuaded, even after carefully considering the product of those exertions, that the *Batson* challenge would have succeeded had trial counsel presented them as set out in

---

[53] *J.E.B. v. Alabama,* 511 U.S. 127, 129 (1994).
[54] Def.'s Resp, at 30-43, D.I. 124.

Broomer's Response. Nor is the Court persuaded that trial counsel's presentation of the *Batson* challenge was deficient.

In its Opinion on Remand, the Court determined that the State's explanations for its strikes were race-neutral.[55] Therefore, in relitigating the *Batson* issues as an IAC claim, Broomer must convince the Court that the arguments he contends trial counsel should have made would have persuaded the Court that the State's strikes were not race-neutral. Otherwise, Broomer cannot meet *Strickland's* prejudice requirement. The Court has considered each of those enhanced arguments Broomer contends trial counsel failed to make. It is unpersuaded that counsel was ineffective in not making them.

First, Broomer argues that there was no fact-based substantive reason to strike juror Aleta Clay. She was employed as a "license inspector" by the City of Wilmington. The State struck her because it thought she might be familiar with the area of the shooting and the families of the people involved.[56] Broomer argues that trial counsel should have argued that these reasons were not fact-based, but speculative, and thus pretextual. It was trial counsel's contention that there was no information confirming that the juror did in fact work in the area. This argument is not materially different from the one Broomer argues trial counsel should have made. Whether the exercise of a

---

[55] *State v. Broomer,* at 8, D.I. 57.
[56] Tr. Aug. 8, 2016, at 91-92.

22

peremptory challenge is based on facts or speculation is not the issue. Trial lawyers exercise peremptory challenges for a variety of speculative reasons, often based on experience and intuition. What the State may not do is exercise a strike based on race. The question is whether the State proffered a credible, race-neutral explanation for its strike. Nothing Broomer has presented in his AMPCR or Response persuades the Court that trial counsel were ineffective in advocating his position with respect to Aleta Clay, or that the State struck her based on her race.

Broomer next argues that "There is absolutely nothing wrong with a [sic] Karen Price."[57] The State explained that it struck Karen Price because she was "adamantly" opposed to the death penalty and seemed unaware that this case was not a death penalty case.[58] Trial counsel responded that the State's reason seemed illegitimate and the only reason for striking her was because she was a black female.[59] Neither the AMPC or the Response adds anything qualitatively different to trial counsel's argument. Therefore, Broomer has not shown neither performance deficiency, nor prejudice.

Broomer addresses Natalia Munoz-Bonila, a Hispanic female, next. The State explained that it struck her because, "Ms. Munoz's education says college, and her occupation is a housekeeper, that led me to believe either she

---

[57] Def.'s Resp., at 33, D.I. 124.
[58] Tr. Aug., 8, 2016, at 93.
[59] *Id.,* at 94.

wasn't successful at college or education level may be incorrect, and for that reason, I wasn't too keen on her either way."[60] Broomer contends that trial counsel should have contrasted Munoz-Bonila with two jurors who were seated, Eric Gilchrist and Tyra Hearne.[61] He claims both of those jurors went to college and held jobs that did not require their level of education, but the State did not strike them. Gilchrist listed his education as "shipping and receiving," while Hearne listed hers as "sales."[62] Gilchrist listed his education as "college," and Hearne listed hers as "post-grad."[63] It is not clear to the Court that there is an obvious disparity between he levels of education of jurors Gilchrist and Hearne and their occupations. But what Broomer fails to mention is that both Gilchrist and Hearne are black.[64] Apparently, he is under the impression that they were "'nonminority jurors who were seated."[65] This mistake dooms his argument.

The final juror who was the subject of the *Batson* challenge at trial was Jacqueline Riggs-Potts. Riggs-Potts was employed as a "judicial case processor 1" in the Family Court.[66] The State struck her because it was concerned that both defense trial counsel practice in Family Court and "the

---

[60] *Id.,* at 92.
[61] Def.'s Resp., at 35-36, D.I. 124.
[62] Juror Profile.
[63] *Id.*
[64] *Id.*
[65] Def.'s Resp., at 35-36, D.I. 124.
[66] Juror Profile.

idea was it was just too close to home."[67] Trial counsel did not challenge this explanation. Broomer now alleges that trial counsel was ineffective in conceding the argument about this juror.[68] The reason proffered by the State is clearly race-neutral, and Broomer's argument fails.

Broomer's remaining arguments contend that trial counsel were ineffective in not challenging the credibility of the State's explanations based on comparisons with seated jurors, and for not suggesting that stricken jurors be recalled for further clarifying *voir dire.*[69] The comparisons proffered by Broomer are inapposite, and the suggestion to call back stricken jurors for further questioning impractical and incapable of eliciting relevant information.

## C.    Cross-Examination of Nicodemus Morris (Claim 3).

Broomer argues that trial counsel was ineffective in his cross-examination of Nicodemus Morris. Morris was present with Mangrum when he was shot and returned fire at Broomer and Mayfield as they fled the scene. The particulars of this claim are difficult to follow and mostly consist of representations that Morris' credibility was not sufficiently put in doubt

---

[67] Tr. Aug., 8, 2016, at 92-93.
[68] Def.'s Resp., at 36, D.I. 124.
[69] *Id.*, at 37-44.

because he said different things to different people at different times, which trial counsel did not effectively challenge on cross-examination.[70]

Broomer provides no specific citation to the record for any of the statements he references in his Response, including various police reports, and out of court statements, which typically are not part of the record. Instead of simply treating these claims as unsubstantiated, the Court reviews the cross-examination of Nicodemus Morris and make its own judgment of trial counsel's effectiveness.

Trial counsel impeached Morris with his criminal history,[71] his receipt of immunity for his conduct on the date of the shooting, including illegally possessing a firearm and ammunition while prohibited from doing so,[72] the State's agreement to continue his probation instead of seeking to have him violated,[73] his cooperation agreement with the State,[74] his flight from the scene, and his failure to cooperate with the State until after he had been immunized.[75] Trial counsel also cross-examined Morris regarding the events giving rise to the State's motive theory, and developed a counter-motive for Mangrum to retaliate against Broomer because Broomer testified against

---

[70] Def.'s Resp., at 46-49, D.I. 124.
[71] Tr., Aug. 11, 2016, Nicodemus Morris Cross-examination, at 163-64.
[72] *Id.,* at 165-66.
[73] *Id.,* at 166.
[74] *Id.,* at 165-66.
[75] *Id.,* at 167-68.

Mangrum in a case in which they were co-defendants.[76]  He induced Morris to admit he was armed with a 9mm handgun when both Mangrum and Morris went back to the Fresh Grocer to "track Mr. Broomer down or locate Mr. Broomer."[77]  He cross-examined Morris on the positions of Mangrum, Stevens, and Morris, with Morris agreeing that his testimony was inconsistent with Stevens' testimony.[78]  He questioned the reasonableness of Morris' testimony that he ran 30 yards to retrieve his gun from where he has hidden it when he observed the Focus, despite testifying that he had the gun on his person earlier.[79]  He cross-examined Morris about the location of the 9mm spent shell casings inducing Morris to concede that he "can't explain" their locations which "almost contradicts [his] testimony."[80]  Finally, Morris acknowledges his 9mm handgun, which he claims he gave to a friend, was used in a shooting that night and another the next day.[81]  The Court concludes that trial counsel's cross-examination clearly was not deficient and Broomer suffered no prejudice.

**D.    Cross-Examination of Tyezghaire Stevens (Claim 4).**

---

[76] *Id.,* at 169-75.
[77] *Id.,* at 181.
[78] *Id.,* at 183-85.
[79] *Id.,* at 185-91, 198.
[80] *Id.,* at 193-205.
[81] *Id.,* at 206-07.

Broomer's complaint that trial counsel did not effectively cross-examine Tyezghaire Stevens, who was shot also, suffers from the same infirmities as his IAC complaint regarding the cross-examination of Nicodemus Morris.[82]  Additionally, he claims that portions of Stevens' out of court statements are missing.[83]  He has not substantiated that claim.  The Court reviews the cross-examination of  Stevens and makes its own judgment about its effectiveness.

Stevens' testimony was helpful to Broomer on several points.  First, she said she did not see Morris in the alley during the shooting, contrary to what Morris would testify.[84]  She claims to have seen four occupants of the blue Focus, contrary to the State's claim that there were only two occupants.[85]  She could not identify anyone in the car, and she did not see anyone get out of the car.[86]  All of these points were helpful to Broomer, and for trial counsel to attempt to attack her credibility as Broomer suggests, would have undermined her helpfulness.  The cross-examination of Tyezghaire Stevens clearly was not deficient and Broomer suffered no prejudice.

### E.  Failure to Object to the Prosecution's Closing Argument (Claim 5).

---

[82] AMPCR, Attach 1, at 4, D.I. 79; Def.'s Resp., at 50-52, D.I. 124.
[83] *Id.*
[84] Tr. Aug. 11, 2016, Tyezghaire Stevens Cross-examination, at 88.
[85] *Id.,* at 91.
[86] *Id.,* at 93-94.

Broomer faults both trial counsel and appellate counsel for failing to address what he refers to as prosecutorial misconduct in summation.[87] This argument fails because appellate counsel did raise issues of prosecutorial misconduct of appeal. The Delaware Supreme Court was not persuaded.[88] New claims of failure on counsel's part to address prosecutorial misconduct are not cited with specificity to the record and therefore are unsubstantiated.

## F.  Failure to Object to Evidence of Prior Drug Trial (Claim 6).

Broomer alleges that trial counsel was ineffective in failing to object to evidence of a prior drug trial and what he describes as "unchallenged hearsay testimony" from Morris that Broomer was upset that Mangrum had called him a snitch.[89] Trial counsel's affidavit explains that, because Broomer testified against Mangrum at the prior drug trial, evidence of that trial would have served to undercut the State's theory that Broomer had a motive to harm Mangrum.[90] Rather, it was Mangrum who had the motive to harm Broomer.[91]

Morris testified that he observed a trial in which Broomer and Mangrum were co-defendants.[92] He further testified that Broomer testified falsely that the drugs that were the subject of the charges belonged to Mangrum.[93] Morris

---

[87] AMPCR, Attach 1, at 2-4, D.I. 79; Def.'s Resp., at 53-56, D.I. 124.
[88] *Broomer v. State,* at 7-13, D.I. 53.
[89] AMPCR, Attach 1, at 4, D.I. 79; Def.'s Resp, at 57, D.I. 124.
[90] Trial Counsel's Aff. at 6, D.I. 81.
[91] *Id.*
[92] Tr. Aug. 11, 2016, Nicodemus Morris Direct Examination, at 140-41.
[93] *Id.,* at 140.

then testified that Mangrum was angry with Broomer and told people what Broomer had done.[94] After that, the two were no longer friends.[95] Morris testified on re-direct examination that calling someone a snitch was deemed disrespectful and was not appreciated and would "cause problems."[96]

Again, Broomer's failure to cite to the record with precision undermines his argument. He asserts that trial counsel failed to object to the hearsay statement that Broomer was upset that Mangrum called him a snitch. However, he does not identify a specific hearsay statement. To the extent he is referring to his own reaction, it is not hearsay. To the extent he is referring to Mangrum calling Broomer was a snitch, that statement is not hearsay because it was not offered to prove Broomer was a snitch. It was offered to elicit Broomer's reaction to it. In any event, the record reflects that Morris made no explicit hearsay statement. Broomer has failed to substantiate his claim that trial counsel was ineffective in failing to object to hearsay testimony. Regarding the testimony about the drug trial generally, the Court finds trial counsel's explanation a reasonable strategic choice and that does not rise to the level of a performance deficiency. Broomer suffered no prejudice from that strategic choice.

## G. Carl Rone Issues (Claim 7).

---

[94] *Id.*, at 141-42.
[95] *Id.*, at 143.
[96] Tr. Aug. 11, 2016, Nicodemus Morris Re-direct Examination, at 212-13.

Carl Rone ("Rone"), a forensic firearms examiner, testified for the State at trial and offered certain expert opinions. In May 2018, after trial and after the completion of Broomer's direct appeal, Rone was arrested and charged with providing false information on time sheets for work in 2016 and 2017.[97] He later pled guilty to Theft by False Pretense and Falsifying Business Records.[98]

Broomer argues that: 1) exculpatory information about Rone's criminal misdeeds was not provided to the defense in violation of the State's *Brady*[99] obligations; 2) trial counsel did not effectively cross-examine Rone; and 3) trial counsel did not retain a defense ballistics expert.[100] The Rone claims miss the mark. Although the charges against Rone alleged illegal conduct during 2016 and 2017, there is no evidence that anyone other than Rone knew he was committing crimes at that time. Broomer does not explain how the State was supposed to disclose the details of Rone's misconduct to the defense when the State was unaware of that misconduct itself. The Court is unaware of any rule of law requiring the retroactive re-examination of the State's compliance with *Brady* solely because a witness was convicted of a crime

---

[97] D.I. 90, at 45-46.
[98] *Id.*
[99] *Brady v. Maryland,* 373 U.S. 83 (1963).
[100] AMPCR, Attach 1, at 4; D.I. 79; Def.'s Resp., at 59-63, D.I. 124.

years after the witness testified. Thus, there is no basis to claim a *Brady* violation.

The criticism of trial counsel's cross-examination of Rone must be viewed in the context of what information was known to trial counsel, and trial counsel's defense strategy. Since Rone's criminality was unknown to the State, it obviously was unknown to trial counsel, and could not have provided a basis upon which to cross-examine Rone. Further, in devising a defense strategy, trial counsel was confronted with the incontrovertible fact that Broomer was the driver of a vehicle that fled from the scene of a homicide.[101] The strategy adopted by trial counsel – that Broomer was unaware Mayfield was going to shoot Mangrum and that he fled out of panic – was without doubt a reasonable strategy, and likely the best one available.[102] On direct-examination, Rone identified the .40 caliber handgun recovered from where a police officer saw it being thrown from Broomer's car as having fired the .40 caliber shell casings recovered from the homicide scene.[103] Rone was unable to compare the 9mm casings from the scene with a particular weapon because no 9mm was recovered.[104] He did determine that the 9mm casings were fired

---

[101] A police officer witnessed the shooting. A .40 caliber handgun was recovered from an area where another police officer saw it being thrown from Broomer's vehicle and a .380 caliber handgun with one spent casing five live rounds was also found in the area along the path of the chase.

[102] Trial Counsel's Aff., at 7-8, D.I. 81.

[103] Tr, Aug, 11, 2016, Carl Rone Direct-Examination, at 23-23.

[104] *Id.*

from the same gun, however.[105] Nothing in Rone's testimony was inconsistent with the defense strategy, and in fact his testimony was consistent with it. Thus, there would have been no purpose in attacking Rone's credentials or testimony.

Broomer claims that trial counsel was ineffective in failing to obtain a defense forensics firearm examiner. Because Rone's conclusions supported the defense's strategy, there was no need to retain one. That decision was reasonable and not a performance deficiency. Since postconviction counsel has not retained one either, it is mere conjecture that a defense expert would have contradicted Rone. Conjecture does not establish prejudice.

## H. Failure to Investigate and Call Exculpatory Witnesses (Claim 8).

Broomer suggests that two potential witnesses, Mildred Munce, and co-defendant Atiba Mayfield, would have provided innocent explanations for him being at or near the crime scene.[106] He alleges that the failure to call them amounted to IAC. He also claims text messages from a cell phone reflect an innocent intent to go grocery shopping nearby.[107]

Trial counsel state in their affidavit that they hired a private investigator who interviewed a Katie Munce, as a potential witness.[108] She provided no

---

[105] *Id.* at 24-26.
[106] AMPCR, at 5, D.I. 79.
[107] *Id.*
[108] Trial Counsel's Aff., at 8, D.I. 81.

useful information.[109]  They were not provided any information about Mildred Munce.[110]  Nor has Broomer provided an affidavit from Mildred Munce supporting his claim about her proposed testimony.  Moreover, his claim that cell phone messages and Mildred Munce would establish that he was in the area to go grocery shopping is of marginal relevance at best.  First, the State did not contest that he was in the vicinity of the grocery store.  Second, it does not exclude killing Mangrum as an additional reason for being in the area.  Finally, it does not explain why he was at the location of the homicide, which was not the grocery store.  There is no reasonable likelihood that this additional evidence would have altered the outcome of the trial.

The claim relating to Mayfield fails as well.  As the represented co-defendant, Mayfield was not available to trial counsel to interview or call as a witness without his consent.  That consent almost certainly would not have been given.  He had just been convicted at his own trial in June and was pending sentencing.  Any testimony he might give on Broomer's behalf could have been used against him at any re-trial if his appeal was successful.  More importantly, as trial counsel noted, Mayfield gave a statement to the police implicating Broomer.[111]

I.    **The Flight Instruction (Claim 9).**

---

[109] *Id.*

[110] *Id.*

[111] *Id.*

Broomer claims trial counsel was ineffective in not objecting to the flight instruction given by the Court.[112] The Court give the standard flight instruction which was fully supported by the facts.[113] There was no performance deficiency or prejudice.

## J. The Accomplice Liability Instruction/Absence of *Probst* Instruction (Claim 10).

In the AMPCR , Broomer claims that trial counsel "should have more effectively challenged the absence of any evidence of being an accomplice and the use of the accomplice jury instruction."[114] The issue of the accomplice liability jury instruction was litigated on direct appeal. The Supreme Court upheld this Court's instruction on accomplice liability.[115] To the extent this claim seeks to re-litigate the propriety of that instruction, it is barred by Rule 61(i)(2). To the extent it argues that trial counsel was ineffective in failing to object to the Court giving any accomplice liability instruction, it has no merit. There was ample evidence in the record for such an instruction.

In his Response, Broomer alleges that trial counsel was ineffective in not requesting a *Probst*[116] specific unanimity instruction.[117] But, specific unanimity on a principal/accomplice theory for conviction normally is not

---

[112] AMPCR, Attach 1, at 5-6, D.I. 79.
[113] Superior Court Pattern Criminal Instructions, § 4.39.
[114] AMPCR, Attach 1, at 6, D.I. 79.
[115] *Broomer v. State*, at 4-6, D.I. 53.
[116] *Probst v. State,* 547 A.2d 114 del. 1988).
[117] Def.'s Resp., at 68-70, D.I. 124.

required.[118]  None of the specific circumstances requiring a specific unanimity instruction identified in *Probst* were present here.[119]

## K.    The Court's Alleged Private Off the Record Communication with the Jury (Claim 11).

In his AMPCR, Broomer alleges that trial counsel should have objected to the Court speaking to the jury privately and off the record during deliberations, and to his personal absence from a teleconference on remand addressing the *Batson* issue.[120]  In his Response he alleges that the Court "announced that it was going into the jury room to see the jury with a court reporter.  But he did not bring the court reporter with him."[121]  He also makes oblique references to sidebar scheduling conferences, and a question from the jury.[122]

At trial, the Court most emphatically did not engage in any private off the record conversations with the jury during its deliberations, or at any other time.  The jury began its deliberations on August 15, 2016 but did not reach a verdict that day.  With the permission of counsel, instead of reassembling everyone in the courtroom to excuse the jury, the Court, along with a court reporter, went into the jury room to excuse the jury for the day.  There, the

---

[118] *Probst,* at 120.
[119] *Id.,* at 121.
[120] AMPCR, Attach 1, at 6, D.I. 79.
[121] Def.'s Resp., at 71, D.I. 124.
[122] *Id.*

Court excused the jury, reminded them of the Court's usual instructions, established a time to resume deliberations the following day, and instructed the jury not to resume their deliberations until all 12 jurors were present. Apparently that event was not transcribed. Regardless, the Court did not engage in any behavior prejudicial to Broomer. The other instances where Broomer complains he was not physically present were sidebar scheduling conferences and the *Baston* conference on remand.[123] He is unable to show any prejudice because of his absence or performance deficiency by counsel.

**L.    Failure to Object to the Verdict Form (Claim 12).**

Broomer faults trial counsel for failing to object to the verdict form because it did not contain a "hung jury" option.[124] The jury was properly instructed and there is no legal basis for trial counsel to request a "hung jury" option. In any case, such a request would have been denied.

**M.    Absence of a *Batson* Hearing on Remand (Claim 13).**

Broomer alleges appellate counsel should have "taken further steps to have a *Batson* hearing on remand," at which the excusal of certain other jurors could have been explored.[125] Broomer does not identify what further steps counsel should have undertaken. In his Response he mostly reiterates many of the same arguments advanced in his initial *Batson* argument. The Court

---

[123] Broomer was present when the jury's note was answered.
[124] AMPCR, Attach 1, at 6, D.I. 79; Def.'s Resp., at 57-59, D.I. 124.
[125] *Id.*

has already addressed the bulk of this claim in Section V(A)(1), above. To the extent this claim argues for challenging the excusal of other jurors, such a challenge would have been outside the scope of remand. This Court was directed to complete its analysis of the *Batson* claim. It was not authorized to conduct a full-scale review of the jury selection process.

**N.      Explaining the Conspiracy Charge to Broomer (Claim 14).**

In his AMPCR, Broomer simply writes, trial counsel "explained to Defendant that if Defendant was found not guilty of Conspiracy, then he could not be found guilty of any of the other chargers. The jury verdict proved this not to be true."[126]   In his Response, Broomer explains that this alleged misinformation adversely affected his consideration of the State's plea offer.[127]   In their affidavit, trial counsel represent that they, "tried to explain to [Broomer] the legal requirements that the  State needed to prove including theory of accomplice liability and how that theory applied to his case."[128]

Prior to the start of the trial, the Court conducted a colloquy with Broomer. The purpose of that colloquy was to discuss with him the State's plea offer.  The Court explained to Broomer the charges and potential sentences he was facing if he were to be convicted at trial, including a sentence

---

[126] AMPCR, Attach. 1, at 6, D.I. 79.
[127] Def.'s Resp., at 77, D.I. 124.
[128] Trial Counsel's Aff., at 10, D.I. 81.

of life without probation or parole on the murder first degree charge.[129] The Court reviewed the plea offer extended by the State which contemplated a no contest plea to Manslaughter and PFDCF with certain sentencing agreements.[130] Those agreements were that the State would not ask for more than 15 years in prison, while Broomer would not ask for less than eight.[131] The Court advised Broomer that it would order a presentence investigation and what information would be provided to the Court as a result of that investigation.[132] The Court also told Broomer that it would take the parties sentencing recommendations very seriously, and absent some unforeseen circumstance there was a "very good likelihood" it would impose a sentence within the recommended range.[133] Broomer told the Court he understood the terms of the plea offer.[134] The Court told Broomer that his co-defendant, Mayfield, was convicted of first degree murder on virtually the same evidence the jury would hear in his case. [135] The Court then explained the concept of accomplice liability to him.[136] Broomer told the Court he understood.[137] He also told the Court that he had enough time to talk to trial counsel about his

---

[129] Tr. Aug. 8, 2016, at 4-5.
[130] *Id.,* at 6-7.
[131] *Id.,* at 8.
[132] *Id.,* at 7.
[133] *Id.,* at 8-9.
[134] *Id.,* at 9.
[135] *Id.,* at 9-10.
[136] *Id.,* at 10-11.
[137] *Id.,* at 11.

decision, and that he had talked to his parents as well.[138] The Court took the unusual step of trying to give Broomer a sense of perspective about an eight to 15 year sentence for someone his age.[139] Lastly, Court provided Broomer with an additional opportunity to meet with trial counsel and his family.[140] It was with a full understanding of the plea offer, the potential consequences of trial, the concept of accomplice liability, and the risks involved, Broomer elected to reject the plea offer.[141]

Considering the representations of trial counsel in their affidavit, and the extensive plea rejection colloquy the Court conducted with Broomer, the Court gives no weight to the unsworn allegation in the AMPCR and Response that trial counsel misled him about the consequences of an acquittal of the conspiracy charge. The simple fact is that Broomer was determined to go to trial, and no amount of persuasion would convince him otherwise.

**O.    Inadequate Investigation (Claim 15).**

Broomer repeats his allegation that trial counsel's investigation was inadequate because they did not interview unnamed people in a crowd at the scene of the shooting as well as Mildred Munce and Atiba Mayfield.[142] In their affidavit, trial counsel state that they retained an investigator who, along

---

[138] *Id.,* at 11-12.
[139] *Id.,* at 13-15.
[140] *Id.,* at 15-16.
[141] *Id.*
[142] Def.'s Resp., at 78, D.I. 124.

with trial counsel, interviewed anyone identified in the police reports and anyone Broomer wished to be interviewed.[143] They also note Broomer was not cooperative with the defense team.[144] Broomer has not identified any witnesses, other than Munce and Mayfield[145] or what any witness would say helpful to Broomer. Broomer has failed to substantiate this claim.

## P.    The Cellphone (Claim 16).

Broomer claims that trial counsel were ineffective in not retrieving cellphone messages purporting to provide an innocent explanation for him being in the area to give Mildred Munce a ride to a store, or to have Munce or Mayfield testify to that effect.[146] He also repeats his allegations regarding a trial counsel's failure to retain a ballistics expert.[147] Trial counsel state that they did review Broomer's cellphone.[148] They found no exculpatory information on it, but instead found incriminating information related to Broomer seeking to purchase of a gun.[149]

The Court previously addressed claims related to Munce and Mayfield in Section V(H) and to the value of a defense ballistics expert in Section V(G).

---

[143] Trial Counsel's Aff. at 10-11, D.I. 81.
[144] *Id.*
[145] *See,* Sec. V(H).
[146] AMPCR, Attach. 1, at 7, D.I. 79; Def.'s Resp., at 79, D.I. 124.
[147] *Id.*
[148] Trial Counsel's Aff. at 11, D.I. 79.
[149] *Id.*

There is no need to address them again here. Broomer has failed to substantiate this claim.

**Q.    Change of Venue (Claim 17).**

Broomer argues that trial counsel was ineffective in failing to move for a change of venue.[150] There was no basis for changing the venue of trial and such a motion would have failed. Publicity was not extensive, and the Court had little difficulty impaneling an impartial jury.

**R.    Unreported Sidebar Conferences (Claim 18).**

Broomer reiterates the allegations addressed above at Section V(K) and adds an allegation that appellate counsel was ineffective in failing to raise an issue about unreported sidebar conferences. Typically, the Court announced prior to an off the record sidebar conference that it would address scheduling matters.[151] In fact, Broomer has not pointed to any off the record sidebar conference that was not preceded by the Court stating the sidebar conference would address scheduling. Broomer has failed to identify any prejudice to him because appellate counsel did not question "the absence of

---

[150] AMPCR, Attach. 1, at 7, D.I. 79; Def.'s Resp., at 80, D.I. 124.
[151] *See, e.g.,* Tr. Aug. 8, 2016, at 33 (THE COURT: Come to sidebar regarding scheduling); *Id.,* at 192 (MR. ROBERTSON: Can we approach scheduling-wise? THE COURT: Sure); Tr. Aug. 11, 2016, at 50 (THE COURT: Thank you Mr. Rone. You can step down. Sidebar for scheduling); Tr. Aug. 12, 2016, at 119-20 (THE COURT: Sidebar, please, regarding scheduling.).

sidebar conversations in the record on appeal." Thus, has failed to substantiate this claim.

**S.    Failure to Advise Broomer He Could Appeal to the United States Supreme Court (Claim 19).**

Broomer makes the claim in his Response that "Had Counsel appealed Broomer's direct appeal to the U. S. Supreme Court, Broomer's case would have been overturned due to the violation of his constitutional rights and violation of his 6th and 14th Amendment rights."[152] Appellate counsel disputes this claim.[153] There is absolutely no reason to believe this assertion is true, and every reason to believe it is not. Broomer has not established that any of his constitutional rights were violated. He has failed to offer any persuasive reason the believe the United States Supreme Court, which grants *certiorari* in very few cases would have granted *certiorari* in his. So, even if appellate counsel had not advised him about an appeal to the United States Supreme Court, Broome cannot show prejudice.

**T.    Failure to Request a Chance Instruction (Claim 20).**

Broomer withdrew this claim in his Response.[154]

**U.    Permitting Det. Fox to Testify as an Expert (Claim 21).**

---

[152] AMPCR, Attach 1, at 7, D.I. 79; Def.'s Resp. at 82-83, D.I. 124.
[153] Appellate Counsel's Aff., at 8-9, D.I. 82.
[154] Def.'s Resp., at 84, D.I. 124.

Broomer asserts that trial counsel allowed Det. Fox to testify as an expert without being designated as an expert witness.[155] His specific complaint is somewhat difficult to fathom, but it appears to be that Det. Fox gave expert testimony comparing a .380 handgun recovered after the chase with a photograph of a gun on Broomer's cellphone. This argument fails because the Delaware Supreme Court held that Det. Fox's opinion that gun in the photograph is "consistent" with a gun recovered from the Focus was not an expert opinion.[156]

## VI. CONCLUSION

For the reasons set forth above, Defendant Michael Broomer's Amended Motion for Postconviction Relief is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, Judge

---

[155] AMPCR, Attach 1, at 7, D.I. 79; Def.'s Resp., at 85-86, D.I. 124.
[156] *Broomer v. State,* at 16, D.I. 53.